**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 45094**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **Opinion Filed: May 2, 2019** |
| Plaintiff-Respondent, | ) |
| | ) **Karel A. Lehrman, Clerk** |
| v. | ) |
| | ) |
| JAYSON L. WOODS, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. George A. Southworth, District Judge.

Judgments of conviction for first degree murder, conspiracy to commit robbery, and accepting the earnings of a prostitute, <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Theodore S. Tollefson, Deputy Attorney General, Boise, for respondent.

---

HUSKEY, Judge

A jury found Jayson L. Woods guilty of first degree murder, robbery, conspiracy to commit robbery, and accepting the earnings of a prostitute. On appeal, Woods argues the district court erred in allowing testimony of the witness who downloaded evidence from Woods's cell phone via two-way Skype[1] video in violation of the Confrontation Clause. Woods also argues his convictions of conspiracy to commit robbery and first degree murder constitute double jeopardy amounting to fundamental error. For the reasons provided below, we affirm.

---

[1]     Skype is a two-way conferencing system that facilitates video and voice conversations between computers, tablets, mobile devices, and other electronic systems.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

Woods was charged with first degree murder, conspiracy to commit robbery, robbery, and accepting the earnings of a prostitute. Woods pled not guilty and went to trial. The facts presented at trial by various testimony were as follows. Under Woods's direction, three men, Kelly Schneider, Daniel Henkel, and Kevin Tracy, and one woman, Abigail Williams, posted escort advertisements online. Initially, sexual services were performed for money; Woods coordinated and organized the activity. After some time, an additional scheme developed. If anyone responded to the advertisements, the plan was to steal any money found without providing any sexual services.

On the night of the murder, Woods drove the group around while they waited for someone to respond to one of the advertisements. The victim (Victim) eventually responded to Schneider's advertisements, and Woods instructed Schneider to respond. Schneider responded, asking Victim to meet at a nearby store. Woods dropped Schneider off at the store. Shortly after being dropped off, Schneider returned to Woods's car, explaining that he had taken Victim's money without performing any sexual act. Schneider then gave Woods the money, which Woods divided between himself and Schneider.

Woods continued to drive the group around until Victim texted Schneider again, requesting to meet. Woods instructed Schneider to reply that he would meet Victim. Woods then drove Henkel and Tracy to a nearby lake and dropped them off, telling them to hide in the bushes in case Schneider needed help. Woods next drove Schneider to a store to meet with Victim and, at some point, Woods texted Schneider instructing him to steal Victim's car. The plan was that Victim would drive Schneider to the lake where Tracy and Henkel hid, and Schneider would take Victim's money without performing any sexual acts.

As Henkel and Tracy waited in the bushes, Tracy texted with Woods. Tracy texted Woods that Henkel would use a pipe to get Victim out of his car if needed. Woods responded, "Good. Do what you have to." After half an hour, Schneider texted he was on his way to the lake. At the lake, the car pulled up, Schneider and Victim got out, there was a scuffle, and Schneider yelled for Henkel. Schneider then got on top of Victim, pushing Victim's face in the dirt with Schneider's knee in Victim's back. Victim yelled "Don't kill me" and screamed in pain as Schneider kicked Victim repeatedly. Schneider yelled for Tracy to get into Victim's car as

2

Schneider continued to kick Victim, threw Victim's shoes, and removed Victim's clothes. After putting the clothes in the back of the car, Schneider drove off in Victim's vehicle with Tracy inside. They stopped to pick up Henkel and drove to an apartment building. The three men left the car at the apartment building and walked to a convenience store where Woods and Williams picked them up. Schneider gave Woods the money Schneider had taken from Victim, and Woods split Victim's money between himself and the passengers, excluding Henkel.

Meanwhile, Victim began banging on doors until a local resident called 911. Victim relayed the night's events to a police officer before being taken to a hospital in an ambulance. As a result of the recent attack and beating, Victim eventually went into cardiac arrest and died.

At the end of the seventh day of the eleven-day jury trial, the State requested that Berrios, a witness from Virginia, be allowed to testify via two-way Skype video in order to lay foundation for the data that was retrieved from Woods's cell phone. The State argued that Berrios's testimony via Skype rather than in-person was necessary because the data recovery was only recently returned and was only provided to Woods the previous day. The State also argued that because Woods objected to the State's previous request for a continuance, he waived any right to object to the late disclosure. Woods objected to the admission of the testimony, arguing that pursuant to *Maryland v. Craig*, 497 U.S. 836 (1990), such testimony violated his Sixth Amendment right to confront the witness because using Skype was not necessary to further an important public policy. First, Woods argued that objecting to a continuance does not automatically waive a right to object. Next, Woods pointed out that the State had the phone for nine months prior to the request for video conferencing and had plenty of time to resolve any issues. Finally, Woods speculated that the reason the State did not fly the witness to Idaho was due to a financial reason and that reason was insufficient to ignore the requirements of the Confrontation Clause of face-to-face confrontation and cross-examination. The State responded that the right to confront is not absolute, the witness was purely foundational, and the State did its due diligence to attempt to get the information as promptly as possible so therefore the court should allow the witness to testify via Skype. At the hearing, the State provided no information about the cost or the practical logistics of getting the witness to Idaho to testify in person, nor did it agree that the absence of the witness was due to a financial burden.

The district court granted the request, stating it had done its own research and found that although Idaho had addressed the issue in regard to a one-way video where a young victim

3

testified while screened from the alleged perpetrator of a sexual assault, Idaho has not yet addressed the precise issue in this case. In reaching its decision, the district court stated:

> I have considered the costs and the time limits of flying somebody from Quantico, Virginia here to Idaho just to identify the process of getting into the phone that they were able to do it and sent a package of results, although not totally printed out, back to Idaho where those results were printed in a usable form in Idaho by the witness that has testified. I think that those are considerations that have been allowed in other cases.

Following the trial, the jury found Woods guilty of first degree murder, conspiracy to commit robbery, robbery, and accepting the earnings of a prostitute. At the State's recommendation, the district court merged the robbery charge with the first degree murder charge and sentenced Woods on the remaining three charges. Woods timely appeals.

## II.

## ANALYSIS

### A. Any Error in Admitting Berrios's Testimony Was Harmless

On appeal, Woods contends two-way video testimony is governed by the rule articulated in *Craig*, and thus the absence of physical face-to-face confrontation is only permitted when necessary to further an important public policy and where the testimony is otherwise reliable. Although Woods does not challenge the reliability or content of the testimony, he maintains that admission of the two-way, video-conferenced testimony was not necessary to further an important public policy, and therefore it violated the rule announced in *Craig*. Woods also argues that Idaho Criminal Rule 43.2 is unconstitutional in light of *Craig*.

The State argues that two-way video testimony does not require a finding of an important public policy to support its admission as is required for a one-way video conference. The State also argues that Idaho Criminal Rule 43.2 allows for such testimony to be presented via two-way video conference without a finding of necessity. However, if a showing of necessity is required, the State argues the timing of the report coupled with the physical and logistical problems of transporting the expert cross-country satisfies the necessity requirement. Alternatively, the State asserts that even if there was a constitutional violation, it was harmless. In support of its harmless error argument, the State contends that the detective testifying regarding the contents of the phone had already laid proper foundation and chain of custody. The State also contends the witness testifying via two-way video was not subject to credibility attacks, and therefore the lack of physical presence was harmless. In addition, the State argues the evidence was sufficient to

4

convict Woods regardless of the data from his phone. Woods argues this misstates the *Chapman v. California*, 386 U.S. 18 (1967) harmless error test. In this case, assuming without deciding the district court erred in admitting the testimony, this Court finds any Confrontation Clause error harmless because a review of the entire record demonstrates a rational jury would have found Woods guilty absent the error.

The harmless error test as set forth in *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010) is: where a constitutional violation occurs at trial, and is followed by a contemporaneous objection, a reversal is necessitated, *unless* the State proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Id.* at 221, 245 P.3d at 973. The United States Supreme Court applied that standard in *Neder v. United States*, 527 U.S. 1, 18 (1999). There, the Court noted that like in cases in which evidence had been admitted in violation of the right to confront witnesses, the harmless error test for Fifth and Sixth Amendment violations and for instructional error "must be essentially the same: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Id.* The Court further explained that a reviewing court applying a harmless error test does not become in effect a second jury to determine whether the defendant is guilty. *Id.* at 19. Instead, "a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the [error]." *Id.*

In subsequent cases, the United States Supreme Court has noted that "since *Chapman*, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Hasting*, 461 U.S. 499, 509 (1983) (citations omitted). In *Hastings*, the Court explained how to apply the *Chapman* test: "The question a reviewing court must ask is this: absent the [error], is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *Hasting*, 461 U.S. at 510-11. The Court noted that *Chapman* required consideration of the entire record prior to reversing a conviction for constitutional errors that may be harmless. *Id.* at 509 n.7. The Court then reviewed the evidence in the case and determined the error was harmless because based on the evidence presented to the jury, "a more compelling case of guilt is difficult to imagine." *Id.* at 511.

The Idaho Supreme Court recently articulated the harmless error standard in *State v. Montgomery*, 163 Idaho 40, 408 P.3d 38 (2017):

5

> "A defendant appealing from an objected-to, non-constitutionally-based error shall have the duty to establish that such an error occurred, at which point the State shall have the burden of demonstrating that the error is harmless beyond a reasonable doubt." *Perry*, 150 Idaho at 222, 245 P.3d at 974. "In other words, the error is harmless if the Court finds that the result would be the same without the error." *State v. Almaraz*, 154 Idaho 584, 598, 301 P.3d 242, 256 (2013).

*Montgomery*, 163 Idaho at 46, 408 P.3d at 44.

The Idaho Supreme Court standard is the same as the harmless error analysis articulated by the United States Supreme Court. Using that standard, we find any error in this case to be harmless. We look at the entire record and the evidence produced at trial to determine whether we can find beyond a reasonable doubt that Woods would have been convicted absent his cell phone records and the testimony related to those records.[2]

At oral argument, Woods noted that most of the facts were not contested and the main issue at trial was Woods's intent to commit the robbery. He asserts that without Berrios's testimony, Exhibits 200, 201, 202, 206, 206A, 208, and 215 would not have been admitted. Woods acknowledges that much of the information from those exhibits was admitted through other witnesses or evidence but argues there was one critical piece of evidence in Exhibit 206A. This was a text from Woods to Schneider that read, "Take if car cuz u are going to need it." Woods acknowledges that this text message was also on Schneider's cell phone, Schneider's cell phone records were admitted at trial, and there was evidence that this text came from someone named Jayson. Nonetheless, he asserts the message was much more persuasive coming from Woods's phone rather than Schneider's phone. This Court concludes that this single text message was not material to establishing Woods's intent to commit the robbery, particularly because virtually the same evidence was admitted without objection through Schneider's cell phone records. While the jury would have to infer that the "jayzon" referenced in Schneider's cell phone records was Jayson Woods, that is not so much a leap of logic or inference, but rather, a very small step that the jury was permitted to make. Additionally, Woods admitted to the detective during Woods's interview that he knew Schneider was going to rob Victim at the lake, which is far more material evidence of Woods's intent than the individual text message.

---

[2] We will assume that the remedy would be to exclude the cell phone records and Berrios's testimony relating to those records even though the remedy for the alleged error does not necessarily require the exclusion of the documentary and testimonial evidence.

Moreover, Woods's guilt was established by the following evidence presented at trial: Woods's direct testimony at trial; evidence of Woods's interview with the detective; testimony of Henkel, Tracy, and Williams;[3] cell phone records extracted from Tracy's phone, Williams's phone, Henkel's phone, and Schneider's phone, along with the text message logs from Victim's phone and Tracy's phone; and the timeline from Williams's phone. Collectively, the evidence shows that Woods, Schneider, Henkel, Tracy, and Williams placed advertisements for escorts on the Internet with a plan to take money without any services provided from those who responded to the advertisements. On the evening of Victim's death, Woods drove Schneider to the store to meet with Victim, which resulted in Schneider taking Victim's money. When Victim requested another meeting with Schneider, Woods, Schneider, Tracy, and Henkel decided that Woods would drive Schneider to meet with Victim a second time. Woods told Schneider to get Victim to drive to a secluded location so that Schneider could take Victim's money. Woods instructed Tracy and Henkel to hide in the bushes at that location in case Schneider needed help. Woods admitted to the detective that the plan was to rob Victim. Woods drove Tracy and Henkel to the lake to hide, and Woods knew Henkel had a pipe with him. Woods knew Henkel and Tracy hid in a remote area waiting in the bushes, assaulted Victim upon arrival, and took Victim's money by physical force.

Reviewing the record as a whole, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty even without the evidence of Woods's cell phone records, generally, or the text message, individually. The record shows beyond a reasonable doubt that the evidence gleaned from Woods's cell phone did not contribute to the jury's verdict. Therefore, the error was harmless.

**B.  Woods Was Not Twice Put in Jeopardy for His Conviction on Conspiracy to Commit Robbery and First Degree Murder**

We next address Woods's double jeopardy argument. Woods was convicted of first degree murder, robbery, conspiracy to commit robbery, and accepting the earnings of a prostitute. The district court merged the robbery and first degree murder convictions. Woods now argues his sentences imposed for the conspiracy to commit robbery and first degree murder violate the double jeopardy clause of the Idaho Constitution because although the district court correctly recognized Woods's robbery conviction merged with the first degree murder

---

[3]     Schneider did not testify.

conviction, it failed to recognize that those offenses also merged with the conspiracy to commit robbery conviction. The State responds that robbery is not a lesser-included offense of conspiracy to commit robbery and therefore not a lesser-included offense of the robbery element in a first degree murder charge. Thus, Woods was correctly sentenced on each charge.

Woods did not raise the issue of double jeopardy below. Generally, issues not raised below may not be considered for the first time on appeal. *State v. Fodge*, 121 Idaho 192, 195, 824 P.2d 123, 126 (1992). Idaho decisional law, however, has long allowed appellate courts to consider a claim of error to which no objection was made below if the issue presented rises to the level of fundamental error. *See State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007); *State v. Haggard*, 94 Idaho 249, 251, 486 P.2d 260, 262 (1971). In *Perry*, the Idaho Supreme Court held that an appellate court should reverse an unobjected-to error when the defendant persuades the court that the alleged error: (1) violates one or more of the defendant's unwaived constitutional rights; (2) is clear or obvious without the need for reference to any additional information not contained in the appellate record; and (3) affected the outcome of the trial proceedings. *Perry*, 150 Idaho at 226, 245 P.3d at 978. We determine the first prong to be dispositive as set forth below.

Whether a defendant's prosecution complies with the constitutional protection against being placed in jeopardy twice is a question of law over which we exercise free review. *State v. Santana*, 135 Idaho 58, 63, 14 P.3d 378, 383 (Ct. App. 2000). The Double Jeopardy Clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The Clause affords a defendant three basic protections. It protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple criminal punishments for the same offense. *Schiro v. Farley*, 510 U.S. 222, 229 (1994); *State v. McKeeth*, 136 Idaho 619, 622, 38 P.3d 1275, 1278 (Ct. App. 2001).

Woods challenges his sentences only under a state constitutional challenge. Under the Idaho Constitution, Idaho appellate courts apply the pleading theory in determining whether a charge constitutes a lesser-included offense. *State v. Thompson*, 101 Idaho 430, 434-35, 614 P.2d 970, 974-75 (1980). In analyzing the applicability of the pleading theory, a court must consider whether the terms of the charging document allege that both offenses arose from the same factual circumstances such that one offense was the means by which the other was

8

committed; i.e., whether the conspiracy to commit robbery was the means by which the first degree murder was committed. *Id*. at 435, 614 P.2d at 975; *see also State v. McKinney*, 153 Idaho 837, 841, 291 P.3d 1036, 1040 (2013); *State v. McCormick*, 100 Idaho 111, 115, 594 P.2d 149, 153 (1979); *State v. Anderson*, 82 Idaho 293, 301, 352 P.2d 972, 976 (1960).

Woods argues that under the pleading theory, he cannot be convicted of robbery and conspiracy to commit robbery because the acts he allegedly committed in furtherance of the conspiracy to commit the robbery were the same acts by which he was alleged to have aided and abetted the robbery. Therefore, the robbery would be subsumed by and merged with the conspiracy to commit robbery. Since the robbery is the felony which underlies the murder charge, the conspiracy then likewise is subsumed by the first degree murder conviction and Woods could only be sentenced on the first degree murder conviction.[4]

The face of the record shows that, as pled, robbery is not an included offense of the conspiracy to commit a robbery.

The charging document alleged in Count I (murder):

> That the Defendant, [] on or about the 29th day of April, 2016, in the County of Canyon, State of Idaho, did aid, abet, assist, facilitate and/or encourage Kelly Schneider to perpetrate a robbery of [Victim], during which Kelly Schneider did kill and murder [Victim].

The charging document alleged in Count II (robbery):

> That the Defendant, [] on or about the 29th of April, 2016, in the County of Canyon, State of Idaho, did aid, abet, assist, facilitate and/or encourage Kelly Schneider to feloniously, intentionally and by means of force or fear take from the person and/or immediate presence of [Victim] certain personal property, to-wit: cash money and/or clothing and/or a wallet with credit cards inside and/or car keys and/or a car, the property of [Victim], which was accomplished against the will of [Victim], in that Kelly Schneider choked [Victim] and or/forced [Victim] to the ground and/or kicked [Victim] and demanded and/or forcibly took [Victim]'s personal property.

The charging document alleged in Count III (conspiracy to commit robbery):

> That the Defendant, [] on or about April 28th, 2016, though April 29th, 2016, within Canyon County, State of Idaho, and elsewhere, the Defendant, [] did willfully and knowingly combine or conspire with Kelly Schneider and/or Daniel Henkel and/or Kevin Tracy and/or any other person to commit the crime of

---

[4]    The Court is not entirely clear why Woods argues he could only be sentenced on the first degree murder conviction because if the robbery is merged into the conspiracy to commit robbery, there is no longer a predicate felony for the first degree murder conviction, as the predicate offense is a robbery, not a conspiracy charge. *See* I.C. § 18-4003(d)

9

robbery upon [Victim], and that in furtherance of the conspiracy and to effect the objects thereof, one or more of the conspirators did the following overt acts within Canyon County, Idaho:

1. On or about April 29th 2016, Jayson Woods drove Kelly Schneider or Daniel Henkel in a Chevy HHR to meet [Victim] at a Walmart in Nampa, Idaho.

2. On or about April 29th 2016, Jayson Woods drove Daniel Henkel and Kevin Tracy in a Chevy HHR to Gott's Point to wait for Kelly Schneider to rob [Victim] at that location.

3. On or about April 29th 2016, Daniel Henkel, armed with a pipe, waited for the arrival of Kelly Schneider with [Victim] at Gott's Point.

4. On or about April 29th 2016, Kevin Tracy also waited for the arrival of Kelly Schneider with [Victim] at Gott's Point.

5. On or about April 29th 2016, Jayson Woods returned with Kelly Schneider to a Walmart in Nampa, Idaho to meet with [Victim].

6. On or about April 29th 2016, Kelly Schneider met [Victim] at a Walmart in Nampa, Idaho.

7. On or about April 29th 2016, Kelly Schneider rode with [Victim] to the prearranged location at Gott's Point in Canyon County Idaho

8. On or about April 29th 2016, Kelly Schneider robbed [Victim] at Gott's Point.

9. On or about April 29th 2016, Kelly Schneider drove away from Gott's Point in [Victim]'s car with Kevin Tracy and Daniel Henkel.

10. On or about April 29th 2016, Kelly Schneider, Kevin Tracy, and Daniel Henkel met back in the Chevy HHR to divide the proceeds of the robbery.

11. On or about April 29th 2016, Kelly Schneider gave Kevin Tracy twenty-five dollars from the proceeds of the robbery.

12. On or about April 29th 2016, Kelly Schneider gave Jayson Woods forty dollars from the proceeds of the robbery.

The Idaho Supreme Court addressed a similar question in *State v. Sanchez-Castro*, 157 Idaho 647, 339 P.3d 372 (2014), the Supreme Court held that the crimes of trafficking in methamphetamine and possession of methamphetamine did not merge into a single offense because as pleaded in the charging document:

The crime of trafficking in methamphetamine is committed when a person "knowingly delivers, or brings into this state, or [ ] is knowingly in actual or constructive possession of, twenty-eight (28) grams or more of methamphetamine or amphetamine or of any mixture or substance containing a detectable amount of methamphetamine or amphetamine." I.C. § 2732B(a)(4). Knowingly possessing a specified quantity of methamphetamine is one manner of committing the crime of trafficking. The language upon which Defendant apparently relies states that he and others conspired "to traffic in a controlled substance, by knowingly possessing methamphetamine." The words "by knowingly possessing

10

> methamphetamine" were not alleged as the means by which the Defendant and others were alleged to have committed the conspiracy. The words obviously referred to the object of the conspiracy--they conspired to traffic in a controlled substance by knowlingly [sic] possessing methamphetamine.

*Sanchez-Castro*, 157 Idaho at 649, 339 P.3d at 374.

Woods argues that because the acts which were the means by which he furthered the conspiracy were also the means by which he aided and abetted the robbery, the robbery is an included offense of the conspiracy to commit robbery. While it is true that many of the overt acts which were done in furtherance of the conspiracy were also acts done to aid and abet the robbery, not all the overt acts of the conspiracy were done in furtherance of the robbery.

As charged in this case, the means by which the robbery was alleged to be accomplished was when Schneider "choked [Victim] and/or forced [Victim] to the ground and/or kicked [Victim] and demanded and/or forcibly took [Victim]'s personal property." The robbery charge alleged that Woods "did aid, abet, assist, facilitate and/or encourage Kelly Schneider to" commit the robbery as accomplished above. The conspiracy to commit the robbery was alleged to have been committed by an agreement between Woods, Schneider, Henkel, and/or Tracy. The State alleged twelve acts in furtherance of the conspiracy, of which Woods participated in four. The overt acts in which Woods participated involved driving Schneider or Henkel to meet Victim at a store on two different occasions, driving Henkel and Tracy to the remote location to rob Victim, and receiving forty dollars from Schneider from the proceeds of the robbery. In looking at the facts as alleged in the elements of each offense, Woods's involvement in the conspiracy was not the means by which the robbery was accomplished. The acts of Schneider choking Victim and/or forcing Victim to the ground and/or kicking Victim and demanding and/or forcibly taking Victim's personal property are not alleged as the means by which Woods was alleged to have committed the conspiracy. Similarly, the agreement or conspire element is not alleged as the means by which the robbery was accomplished.

The charging document required that the State prove that there was an agreement between Woods and another person in order to be guilty of conspiracy to commit robbery. Based on these three charges, the conspiracy to commit robbery was not the means by which the murder was committed. Rather, it was solely the completed robbery which resulted in the murder.

11

Here, the robbery charge was not a lesser-included offense to the conspiracy to commit robbery charge and thus, the conspiracy to commit robbery was not the means by which the first degree murder was committed. Accordingly, Woods's convictions for conspiracy to commit robbery and first degree murder do not violate the Double Jeopardy Clause of the Idaho Constitution. Because we conclude Woods's unwaived constitutional right was not violated, and thus Woods has failed to meet the first prong of the *Perry* test, we need not discuss the remaining prongs.

## III.

## CONCLUSION

Assuming without deciding the district court erred in admitting the two-way, video-conferenced testimony, the record establishes beyond a reasonable doubt that any error did not contribute to the verdict and was therefore harmless. Additionally, under the pleading theory, robbery was not a lesser-included offense of conspiracy to commit robbery, as the robbery charge was not subsumed by and did not merge with the conspiracy to commit robbery. Therefore, the district court correctly imposed separate sentences for both the first degree murder and the conspiracy to commit robbery convictions. Accordingly, the judgments of convictions for first degree murder, conspiracy to commit robbery, and accepting the earnings of a prostitute and sentences are affirmed.

Chief Judge GRATTON and Judge LORELLO **CONCUR**.